GOLDA CLAUSEN, Appellee, v. NEW YORK LIFE INSURANCE
COMPANY, Appellant.

No. 43907.

DECEMBER 14, 1937.

REHEARING DENIED APRIL 8, 1938.

Wm. P. Welch, Raymond N. Klass, Fred E. Egan, and
C. C. Virtue, for appellee.

Milchrist, Schmidt & Marshall, for appellant.

PARSONS, J.—This case is a suit in which the beneficiary of
a policy of insurance, written upon the life of Andy L. Clausen,
July 28, 1930, seeks to recover against the issuer of the policy,
the New York Life Insurance Company.

The face of the policy was for $1,000, but there was a provision in the policy to the effect that if the insured died as the

result of external, violent, and accidental means, that then and in that event the liability of the defendant company would be for $2,000 in lieu of the $1,000.

The insured died on the 21st of March, 1936, by external, violent, and accidental means, and due proof of said fact was made in the manner provided in the policy. But there was a provision in the policy holding that double indemnity should not apply to temporary insurance or to paid-up insurance under ''Surrender Values'', or to any dividend additions provided under ''Participation in Surplus—Dividends.''

Also there was a provision in the policy reading as follows:

''Temporary Insurance.—Insurance for the face of the Policy plus any outstanding dividend additions and any outstanding dividends, including dividend deposits, and less the amount of any indebtedness hereon, shall, upon expiry of the period of grace, be continued automatically as Temporary Insurance as from the date of default for such term as the Cash Surrender Value less any indebtedness hereon will purchase as a net single premium, at the attained age of the Insured at the date of default, according to the American experience table of mortality and interest at three per cent. This Temporary Insurance will be without participation in surplus.''

There was a further provision in the policy, under head of ''Surrender Values'', as follows:

''Participating Paid-up Insurance.—Within three months after such default, but not later, the Insured may surrender this Policy and elect in place of such Temporary Insurance to have this Policy indorsed for the amount of Participating Paid-up Insurance which the Cash Surrender Value at date of default less any indebtedness hereon, will purchase as a net single premium, at the attained age of the Insured at the date of default, according to the American experience table of mortality and interest at three percent. The Insured may obtain a loan on such Paid-up Insurance or surrender it within one month after any anniversary for its cash surrender value.''

And then there was a further provision under head of ''Cash Surrender Value'', to the effect that if the policy shall not have been indorsed for participating paid-up insurance, the insured, within three months after such default, may surrender

the policy and all claims thereunder and receive its cash surrender value as of date. of default less any indebtedness thereon. That the cash surrender value shall be the reserve on the face amount of the policy at the date of default, and the reserve on any outstanding dividend additions, and any outstanding dividends, including dividend deposits, and less a surrender charge for the third to the ninth years, inclusive, of not more than one and one-half per cent of the face of the policy. The reserve shall be computed on the basis of the American Experience Table of Mortality and interest at three per cent.

The insured paid the premiums of $14.57 each six months, payable April 14th and October 14th of each year, until the October 1934 payment. On October 24, 1934, the insured gave what is known as a premium lien note, not a loan on the policy, for $43, to cover the premium for April 14, 1934, and an existing note of $29.43 and interest thereon of $1.77. The note recites on its face that it was accepted by the company in lieu of cash for the said premium and was a lien against said policy and indebtedness thereon.

The note also contained the provision that if there was any default in the payment of the premium on the policy, in that event the sum so due and payable, with interest, shall, without demand or notice of any kind, be deducted in the manner provided in said policy, and thereupon said indebtedness shall be deemed fully paid and satisfied.

The note further provided that whenever the total indebtedness to the company on said policy, however evidenced, shall equal its cash surrender value then in the event of failure to pay interest thereon, said company shall mail to the last known address of the insured, and of the assignee of record at the home office of the company, if any, a notice that the total indebtedness to the company on said policy equals its cash surrender value, and thereupon said policy shall, one month after the mailing of said notice by the company, and without any other or further notice or action, be void and of no effect, unless said defaulted interest shall be paid within one month after the mailing of said notice, and whenever said policy so becomes void and of no effect, all said indebtedness to the company shall be deemed fully paid and satisfied.

The insured having failed to pay the premium lien note, or any of the interest thereon at the time same was due, the com-

pany wrote a letter to the insured under date of August 8, 1935, as follows:

"Mr. Andy L. Clausen                    August 8, 1935
"Logan, Iowa.

| | | Amount of Premium Lien Note |
| Policy Number | Due Date of Unpaid Premium | with Interest thereon $44.29 |
| 11 190 561 | April 14, 1935 | |

"Dear Sir: This Policy having lapsed for non-payment of Premium due, as specified above, the indebtedness against said Policy at date of lapse, as shown above, has been satisfied by deduction from the Cash Value of the Policy pursuant to the terms of the Policy and Premium Lien Note. The excess of the Cash Value over the indebtedness has been used to purchase and has purchased Temporary Insurance for $960.00 expiring January 9th, 1936.

"If you wish any further evidence of the Temporary Insurance than this letter, the Company, upon receipt of the Policy at its Home Office, will indorse such Temporary Insurance upon the Policy and return it to you.

"Yours truly,
"Wm. F. Rohlffs, Secretary. CH"

As the note provided, the defendant took action. This letter was received by the insured, because the evidence shows without dispute that he had possession of it.

It is contended that these various provisions, both in the premium lien note and in the policy, constituted discrimination under section 8666 of the Code, and hence are void. It is evident that if they do not constitute discrimination within the meaning of the statute, the plaintiff is not entitled to recover, and the defendant may have judgment.

These questions were all before the court in motions for directed verdict. The defendant made a motion for directed verdict, setting forth all these propositions. The court sustained the motion in part by refusing the double indemnity under the terms of the policy, and in that the court was correct, and it seems to be practically conceded here. But the court overruled the motion of the defendant as to recovery on the policy for the

face value, and on the motion of plaintiff for directed verdict she claimed to be due on the policy the sum of $978.28. Judgment was entered therefor and the defendant has appealed to this court.

This brings us to a consideration of the statutes involved in the action, and to their proper construction, and as to the rights of the parties.

It is claimed by the defendant-appellant that the deceased having met his death on the 21st of March, 1936, that he was then without insurance, if, under the terms of the policy and under the provisions of the premium lien note the defendant was within its rights in cancelling the policy.

The default in the failure to pay interest on the premium lien note, and failure to pay the April 1935 premium, resulted in the voiding and cancelling of the policy.

Section 8666 of the Code reads as follows:

"No life or casualty, health or accident insurance company or association shall make or permit any distinction or discrimination between persons insured of the same class and equal expectancy of life in the amount or payment of premiums or rates charged for policies of life or endowment insurance, or in the dividends or other benefits payable thereon, or in any other of the terms or conditions of the contract it makes; nor shall any such company or association or agent thereof make any contract of insurance agreement, other than as plainly expressed in the policy issued; nor shall any such company or association or agent pay or allow, directly or indirectly, as an inducement to insurance, any rebate of premium payable on the policy, or any special favor or advantage in the dividends or other benefits to accrue thereon, or any valuable consideration or inducement whatever, not specified in the policy or contract of insurance."

Section 8667 of the Code is as follows:

"Every corporation, officer, or agent thereof who shall knowingly violate any of the provisions of section 8666 shall forfeit and pay a sum not exceeding five hundred dollars, to be recovered by an action in the name of the state for the benefit of the school fund, and the license may be revoked for three years, in the discretion of the court."

Section 8668 of the Code provides:

"It shall be unlawful for any insurance company transacting business within this state, under the provisions of this chapter, to write or use any form of policy or contract of insurance, on the life of any individual in this state, until a copy of such form of policy or contract has been filed with and approved by the commissioner of insurance."

Section 8669 provides for the suspension of authority to transact business within the state, of any company that fails to file such form of policy or contract and have the same approved.

Section 8670 provides the penalty for violation of these provisions.

So in this case we have a policy of insurance, written under the form provided by the commissioner of insurance. There is no showing whatever to the contrary, so it is presumed the statute was obeyed, because we have a commissioner whose duty it is to enforce this law. So then the rights of the plaintiff in this case must rest upon section 8666.

In section 8666 the statute forbids discrimination, and in section 8667 there is provided punishment for an insurance company that violates the provisions of this section, and that punishment shall be not less than five hundred dollars, and further provides that the license may be revoked for three years within the discretion of the court.

So we have here the question as to whether or not the state, having forbidden an act, and having prescribed punishment for violating same, is there any other remedy than that prescribed in the statute?

We have also to consider in this case the fact that every insurance company of this character, lawfully doing business in the State of Iowa, must file with the commissioner of insurance, and have the same approved, the form of its policy. If it does not do so it is subject to certain definite punishment. What then is the aim of these statutes? What would be the effect of holding that the party could go outside the terms of the contract between himself and the company and recover on a contract that he did not make and that the company did not make, on the claim of discrimination, and against the terms of the policy? Are we not, in doing this, going beyond our authority? Insurance is nothing but a matter of contract. True, it is regulated by statute, but the statute prescribes the penalty if the regula-

tions are not followed. Are they made for the benefit of private litigants who may come in and vary the terms of the contract? It seems to us that the purpose of this statute, section 8666, was meant only to repress a practice that was prevalent prior to the enactment of the original statute on this subject, where agents would insure an individual and promise him certain considerations not provided for in the policy, and would discriminate as between different persons, or as between different classes of insurance, by offering inducements. There is a question as to whether the discrimination complained of here is a discrimination within the meaning of section 8666, when it comes to a suit between an individual policyholder or beneficiary and the company. In other words, is that not a question between the State and the offending corporation?

Graf. v. Employers' L. A. Corp., 190 Iowa 445, 450, 180 N. W. 297, 298, is an opinion written by Judge Ladd, and lays down the rule that a life insurance policy is valid and enforcible even though issued without filing a form as required by statute. In that case the form of policy had never been filed in the office of the auditor of state, who then had charge of the insurance department. The court discusses somewhat section 1783-a and 1783-b of the Code Supp. 1913, and Supplemental Supp. 1915. The provisions of these acts now appear in our Code. Those were the sections dealing with the form of the policy. They required the insurance company to file the form with the auditor and an approval before it was used. In the opinion the judge said:

"What we hold is that, notwithstanding the failure of the defendant to obey the statute, it is not relieved thereby from complying with its contract, being estopped from pleading its noncompliance therewith; and that the insured may recover, if at all, only on the terms of the instrument as written."

If that be the rule, and it has never been disputed, then the plaintiff in this case can recover on the policy only upon the form in which the policy is written.

Diehl v. American Life Ins. Co., 204 Iowa 706, 709, 213 N. W. 753, 755, 53 A. L. R. 1528, in an opinion by Judge Morling, concerned the questions which arise in this case. One of the attorneys for the plaintiff in this case appeared as attorney in that case, in both cases he appeared for the plaintiff. In the

Diehl case, as in this, the insured had executed to the company a note for the full amount of the loan value of the policy. The note recited the amount as being "the full amount of the annual premium payable April 30, 1923", and declared that neither the note nor the extension thereof was given or accepted as a payment of said premium, and the giver of the note agreed that the nonpayment of the note or any extension thereof at maturity should *ipso facto* lapse said policy, and there would be due the proportionate part of the face of the note, with interest, that the time from the date of the note or any extension thereof bore to the whole time covered by said premium. He also agreed that upon the nonpayment of the note, or any extension thereof, if said policy had any cash value, "the company might charge the proportionate part of the note, or any extension of same, that might be due, against such cash value, and any extended value it might have to be accordingly reduced."

The note was not paid and the insured died. Notice was given to the company on the day of his death, and the company answered the notice November 5, 1923, claiming lapse "for failure to pay the premium extension note," and stated further that the insured borrowed the entire value of the policy, and that no value remained to carry beyond the date when the note was due. A dividend of $1.10 was applied on the note, as it might be, for the earned portion of the premium not paid. The note had not been surrendered, nor any claim filed on account of it. The case was tried before the court without a jury, and judgment was rendered for the defendant.

The plaintiff in that case claimed that the execution and acceptance of the note paid the premium. The defendant held the note stated that it was not given nor accepted as payment; that by the policy it was plainly stated that, except as in the policy provided, the policy shall be *ipso facto* null and void if any premium is not paid when due.

The court said (p. 711):

"The distinction or discrimination, the contract not expressed in the policy, the form not filed with the commissioner or approved by him, claimed by plaintiff, consists in the extension of time which is the very thing that the plaintiff relies upon to avoid the forfeiture. If plaintiff's position is correct, then the extension of time or the waiver of payment at the time

stipulated is void, within the principle of the cases construing the statute prohibiting discrimination by carriers in interstate commerce.''

The court then calls attention to the fact that the statute does not in terms apply to or prohibit the making of supplementary or later modifying contracts between the company and the insured, not contemplated when the policy was issued. There was a supplementary contract in this case, as in that case; said supplementary contract being found in the note given for the unpaid premium. By the terms of the note, on nonpayment the policy lapsed and there would be due the company only the premium earned during the extension period. There was no agreement and no demand for payment of premium accruing after default. The court said (p. 714):

''We are of the opinion that the extension and the conditions on which it was granted were valid.''

Now in regard to the ''grace'' clause, the court says in its second division of the opinion (p. 714):

''Plaintiff argues that the insured was entitled to the 31 days' grace from the maturity of the note. The language of the policy is that 'a grace of 31 days (without interest charge) will be allowed for the payment of renewal premium'. The insured did not get the 31 days' grace prior to the maturity of the note, October 30, 1923; for the note is dated on the day when the premium by the policy became due, April 30, 1923, and bears interest from date. By the terms of the note, the proportionate part of its amount earned during the extended period, but not the unearned amount, became the liability of the insured, and a charge against the cash or extended insurance value. Extensions of time of payment (except as affected by the 31 days' grace after the stipulated maturity date of the premium) were not contemplated by the policy. The parties by the grace provision of the policy had in mind only grace after the then stipulated maturity dates. The extension of time originated in, and the terms on which it was contracted for expressed solely by, the note. Those terms are plain. By them nonpayment of the note or extension at maturity by that fact lapsed the policy. There would be due the company the earned premium, not for the period of the note and 31 days' grace, but for the period of

the note only. The right to pay the premium after the expiration of the grace provided in the contract existed only by virtue of the note. The *ipso facto* lapsing of the policy by the nonpayment of the note at maturity cannot be distorted into a lapsing by the *ipso facto* failure to pay the note 31 days after its maturity. Grace allowance is not referred to, either directly or indirectly, in the extension arrangement. The agreement for extension was in writing. The writing is complete upon its face. It expresses the terms upon which the note was given and accepted.''

The opinion further says (p. 715):

''Our attention has been directed to no principle which would deny to the company and the insured the right to make a binding obligation to exchange the grace for other, or what the insured may consider equivalent, benefits, in the absence of oppression or fraud. We are of the opinion that the right to grace was waived or exchanged by the extension, the terms of which cannot be modified by importing into them a further provision for grace.''

The opinion finally states (p. 715):

''The insured had consumed the cash value of the policy, and consequently there is no paid-up insurance to which plaintiff is entitled.''

Applying that case to the case under consideration here, we find that the note given by Clausen was not paid on April 14, 1935; consequently, the premiums were not paid, and on that date the policy lapsed. The note covered payment of premium for April 14, 1934, and it included an existing note the company held for $29.43 with interest, which made the total amount of the note $43. So default existed, without question, for nonpayment of premium, on the 14th day of April, 1935. The date of the death of the insured was March 21, 1936, hence at that time the default had unquestionably existed for eleven months and seven days prior to the death of the insured, or a total period of 335 days had elapsed. This exhausted the loan value of the policy and left only $6.37 which could be applied to the purchase of insurance, or continuation of the policy under any of the options provided in the policy. This would purchase

$960 of insurance for only 270 days from the date of the default, under the very terms of the policy itself. So not only had the period elapsed from the date of death of insured, in which he had any right whatever, but 65 days more had elapsed up to the time of his death.

The plaintiff claims in the argument that the insured was not only entitled to 335 days, but also to three months "grace" period by reason of the terms of the policy itself. That is determined by the cash surrender value of the policy and participating paid-up insurance, under the provisions of the policy, which were:

"The Cash Surrender Value shall be the reserve on the face amount of the Policy at date of default, omitting fractions of a dollar per thousand of insurance, and the reserve on any outstanding dividend additions, and any outstanding dividends, including dividend deposits, and less a surrender charge for the third to the ninth years, inclusive, of not more than one and one-half per cent of the face of the Policy."

So the effect of this provision of the policy, giving three months time after default to surrender his policy and receive his cash surrender value, was that he was given merely three months in which to make the election, but the policy which would be issued would be representative of the cash surrender value of the policy at the date of default, less any indebtedness thereon.

It seems to be logical to say that if a policyholder in this position came in the day after default and elected to take the cash surrender value, that he could have his paid-up policy run from the time of his election, which would be practically the day of default; and the insured who came in three months after default and made his election, would be entitled to the same consideration, and the starting period of his policy could be taken out that much later. This would be a discrimination without question, a discrimination in favor of the party who failed to pay promptly and who waited until the last moment to pay or elect. This would be illogical and absurd. It would be penalizing the one who paid promptly and giving a premium to the one who did not.

So on the whole case we find that the court was right in not allowing the double liability, and we also find that the life pol-

icy of $960 was good for the period of 270 days following the lapsing period, April 14, 1935, and the time should be computed from the date of the lapse, and should not be computed from the end of the period claimed as grace period, i. e., the time insured had to make election.

We, therefore, are compelled to reverse the case and direct the lower court to enter judgment for the defendant.—Reversed.

HAMILTON, C. J., and ANDERSON, MITCHELL, DONEGAN, and SAGER, JJ., concur.